U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

FEB 0 8 2006

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| HADY HASSAN OMAR | CIVIL ACTION NO. 02-1933 |
| -vs- | JUDGE LITTLE |
| CARL CASTERLINE, ET AL. | |

## MEMORANDUM RULING ON
## MOTION FOR SUMMARY JUDGMENT

Before the court is a consolidated motion for summary judgment [Doc. #137] filed by Carl Casterline ("Casterline"), Roger Cosgro ("Cosgro"), Eric Transou ("Transou"), and K. McCauley ("McCauley") (collectively the "federal defendants") on 16 May 2005. Hady Hassan Omar ("Omar") filed his opposition to the motion [#140] on 19 July 2005 but it was deficient. The opposition [#150] was properly filed on 17 November 2005. The federal defendants filed their reply [#144] on 19 August 2005.

On 11 September 2003, the court entered a memorandum ruling and judgment [#62] disposing of all claims against defendants Casterline and Cosgro except for the claims relating to the First Amendment free exercise of religion and the Religious Freedom Restoration Act ("RFRA"). 42 U.S.C. §§ 2000bb – 2000bb-4. After the court issued this judgment, the plaintiff filed a First Amended Complaint ("complaint") to add McCauley and Transou as defendants. It also added Fourth and Fifth Amendment violations by Transou and Fifth Amendment violations by McCauley [#99]. With the exception of these claims against

McCauley and Transou, only the free exercise of religion and RFRA claims remain in this case against the federal defendants. For the following reasons, the motion for summary judgment filed by the federal defendants is GRANTED.

## BACKGROUND

Omar, an Egyptian national, was residing and working in the United States with an expired visa in the days leading up to the events of 11 September 2001 ("9/11"). The day after the terrorist attacks against the United States, Omar was taken into custody by three FBI agents but was not arrested. Omar was suspected of being linked to the 9/11 hijackers because he had purchased an airplane ticket for the morning of 9/11 from the same internet account (at Kinko's) and from the same state as two of the known hijackers (Florida). Omar was questioned by the FBI and then was transferred to the Sebastian County Detention Center in Arkansas. He was later transferred to the United States Penitentiary at Pollock, Louisiana ("Pollock") on 16 September 2001 and remained there until 20 November 2001. He was transferred and then released on 23 November 2001. While at Pollock, Omar was allegedly deprived of his First Amendment free exercise rights to practice his Muslim religion. For more factual detail, see the court's published opinion of 11 September 2003. Omar v. Casterline, 288 F. Supp. 2d 775, 776-77 (W.D. La. 2003).

Omar's free exercise allegations are generally as follows: 1) that he was served pork; 2) that the officers refused to tell him the time of day so that he could pray at the appropriate times; 3) that the officers refused to serve him his meals after sundown during Ramadan; and 4) that the officers abused him verbally and nonverbally while he was trying to pray.

2

# DISCUSSION

## I. Legal Standards

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law." Anderson, 477 U.S. at 248. A dispute about a material fact is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (citation and quotation marks omitted).

In making its determination, the court must draw "all justifiable inferences" in favor of the nonmoving party. Anderson, 477 U.S. at 255. Once the moving party has initially shown "that there is an absence of evidence to support the nonmoving party's case," Celotex Corp. v. Catrett, 477 U.S. 317, 325, the nonmoving party must come forward, after adequate time for discovery, with specific facts showing a genuine factual issue for trial. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Such evidence should create more than a "metaphysical doubt" about the material facts, Matsushita, 475 U.S. at 586, and should be more than a theoretical possibility that the claim is good. Pennington v. Vistron Corp., 876 F.2d 414, 426 (5th Cir. 1989). The moving

party need only point out the absence of evidence supporting the nonmoving party's case, and it "need not *negate* the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). Allegations in the pleadings, naked assertions of factual disputes, and conclusory allegations are not sufficient. See Fontenot v. Upjohn Co., 780 F.2d 1190, 1195-96 (5th Cir. 1996).

While the party opposing the motion may use proof filed by the movant to satisfy his burden, "only evidence – not argument, not facts in the complaint – will satisfy" the burden. Solo Serve Corp. v. Westowne Assocs., 929 F.2d 160, 164 (5th Cir. 1991). "Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." Larry v. White, 929 F.2d 206, 211 n.12 (5th Cir. 1991).

### B. Qualified Immunity

In this case, the defendants have pleaded qualified immunity to both the constitutional and statutory allegations made by Omar. Qualified immunity provides protection for officials performing discretionary functions against "civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In evaluating cases under the qualified immunity doctrine, the Fifth Circuit has outlined a two-step analytical process.

First, the court must ask "whether a constitutional right would have been violated on the facts alleged." McClendon v. Columbia, 305 F.3d 314, 322-23 (5th Cir. 2002) (en banc) (citation and quotation marks omitted). If and only if the facts alleged create a genuine

4

dispute as to whether a constitutional violation occurred, then the court will "ask whether the right was clearly established" at the time of the violation. Id. at 323. In other words, even "[i]f the official's conduct was unconstitutional, we determine whether it was nonetheless objectively reasonable in light of judicial precedent at the time of the infraction." Kelly v. Forti, 77 F.3d 819, 821 (5th Cir. 1996). If it was objectively reasonable, the defendant is not liable.

In addition, once the defendant pleads the qualified immunity defense, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." McClendon, 305 F.3d at 323. The plaintiff must show more than simply a generalized right, instead "the right the official is alleged to have violated must have been clearly established in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citation and quotation marks omitted).

Not surprisingly, qualified immunity often turns on the clarity with which prior cases have articulated a particular right. More specifically, the inquiry focuses "not only [on] whether courts have recognized the *existence* of a particular constitutional right, but also on whether that right has been defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." McClendon, 305 F.3d at 331. To demonstrate a clearly established right, plaintiffs need "cases of controlling authority in [their] jurisdiction at the time of the incident which clearly established the rule on which [they seek] to rely, [or they must point out] . . . a consensus of cases of persuasive authority such that a reasonable

officer could not have believed that his actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999). A right, however, may be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Hope v. Pelzer, 536 U.S. 730, 740 (2002) (articulating statutory standard that is "identical" to qualified immunity standard).

## II. Analysis

### A. Personal Participation Requirement

Claims for violations of constitutional rights may be brought directly against federal employees. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Such claims, however, require that the individual either personally participate in the unconstitutional actions or enact "a policy so deficient that the policy itself acts as a deprivation of constitutional rights." Cronn v. Buffington, 150 F.3d 538, 544 (5th Cir. 1998) (noting that "there is no doctrine of respondeat superior in Bivens actions").

Omar has not alleged that an official policy enacted by any of the defendants violated his constitutional rights. He does state that "as a 'special case' detainee, there were no procedures in place for Mr. Omar at Pollock and therefore he would not have access to some means through which Pollock accommodates the religious needs of its inmates." Pl.'s Opp'n 19. Nevertheless, Omar does not allege that any of the federal defendants enacted this "special case" policy. As such, his theory of liability rests on personal participation rather than policy implementation.

### 1. Warden Casterline

Omar does not provide any evidence that Casterline, the warden of Pollock at the time of his detention, personally participated in food service. In addition, Casterline did not make any mocking statements to Omar about his prayer, nor did he refuse to tell Omar the time at any point. Omar, however, nevertheless argues that liability should exist against Casterline because he "bore ultimate responsibility for all operations at Pollock and the well-being of its inmates. As warden, Defendant Casterline therefore presumably had the authority and obligation to see to it that . . . legally protected inmates' rights would not be impinged upon by any prison policy or employee." Pl.'s Opp'n 18. As these passages make clear, Omar seeks to impose liability on Casterline based on his supervisory responsibilities over other officers. This is exactly the sort of vicarious liability that is not permitted in Bivens actions. Cronn, 150 F.3d at 544. As such, all of the remaining claims against Casterline are dismissed.

### 2. Case Manager Cosgro

With respect to the claims regarding food service (both the alleged service of pork and the Ramadan-related food allegations), Omar has failed to offer any evidence of personal involvement by Cosgro, his case manager. As such, these claims are dismissed against Cosgro for lack of personal participation. Id.

With respect to the claims of refusal to provide Omar with the time, Omar has alleged that he asked "Cosgro for a clock so that [he] would know when to say [his] prayers." Pl.'s Ex. 7 ¶ 57. As such, he has articulated personal participation by Cosgro for this claim.

With respect to the claims of mocking his religion, Omar has alleged that Cosgro stated to him, "You think this is going to work?" after he had been praying. Summ. J. Mot. 18; Def.'s Statement of Material Facts ¶ 82. As such, Omar has stated that Cosgro personally participated in this alleged violation of his constitutional rights.

### 3. Lieutenant Transou

Omar has alleged that Transou, a lieutenant, served him food. As such, he alleged personal participation by Transou with respect to the dietary claims.

Omar also alleges that Transou personally refused to tell him the time and that Transou "would come close to the window where [Omar] was praying and stare at [him] until he felt [Omar was] done praying and shake his head and smile and walk away." Summ. J. Mot. 17; see also Def.'s Statement of Material Facts ¶ 81. In addition, he alleges that sometimes Transou "would either be standing in the office across the hallway and look at me praying, talking to another officer or whoever is there, and laughing." Summ. J. Mot. 17; see also Def.'s Statement of Material Facts ¶ 81. As such, Omar has alleged personal participation by Transou with respect to this claim.

Omar also claims that he pointed to his hand where a watch would be in order to signal to Transou that he wanted to know the time. He alleges that Transou did not respond. As such, he has satisfied the personal participation requirement for this claim.

### 4. Officer McCauley

McCauley, an officer at Pollock, admits that he served meals to Omar; this is sufficient to satisfy the personal participation requirement for the food-related claims. With

respect to the mockery claims, "[p]laintiff offered an identical story [as that about Transou] when asked to describe how McCauley allegedly mocked him." Summ. J. Mot. 17; see also Def.'s Statement of Material Facts ¶ 81. In addition, with respect to the time request claims, Omar alleges that McCauley did not respond to his requests for the time. As such, he has met the personal participation requirement for all of the claims against McCauley.

### B.  First Amendment Claims

#### 1.  Dietary Allegations

Omar makes essentially two types of arguments regarding being served pork while he was held at Pollock. As discussed above, Omar has only alleged personal participation by Transou and McCauley.

#### a.  Pork

First, Omar alleges that he was served actual pork in violation of his Muslim religion. It is undisputed that while at Pollock, "Omar was housed in the Health Services Observation Area" which, regarding inmate count, "is considered a part of the Special Housing Unit" ("SHU"). Def.'s Statement of Material Facts ¶ 6. Omar does not dispute that Pollock did not serve pork in the SHU as a matter of policy at the time of his detention. Summ. J. Mot. 11.

Instead, Omar points to menus from the prison which contain a handwritten notation of "Pork Ham (shu) as needed" on 28 August 2001 and 18 September 2001. Pl.'s Ex. 4 at 368, 371. On 28 August 2001, however, Omar was not at Pollock. On 18 September 2001, there is no evidence that McCauley or Transou served him *any* meals. Summ. J. Mot. 15;

Def.'s Statement of Material Facts ¶ 132. In fact, there is no evidence, other than Omar's statement, that Transou served any food to anyone while Omar was at Pollock. Summ. J. Mot. 14; Def.'s Statement of Material Facts ¶ 130, n.25. Furthermore, on the fourteen days when McCauley did serve Omar meals, there is no evidence that any pork was served in the entire prison, even outside of the SHU. Summ. J. Mot. 14; Def.'s Statement of Material Facts ¶ 130.

Omar also states that one of the officers told him that he had been served pork and that he became nauseated at a result. Pl.'s Ex. 7 ¶ 52. In addition, Omar points to a statement that pork products have, in the past, been accidentally served to inmates at federal prisons. Pl.'s Ex. 3. Even taken as true, this sort of statement is not specific and as such will not defeat summary judgment. See FED. R. CIV. P. 56(e); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Finally, Omar claims that he can tell the difference between pork and pork substitutes. He has not, however, offered any credible reason why he can make such a determination. In fact, in making his second argument (discussed below), Omar points to evidence that "nobody could tell the difference between a pork substitute and its actual pork counterpart unless you tasted it and if the quality of the product was good then you're not going to be able to tell the difference." Pl.'s Opp'n 14 (citation and quotation marks omitted); see also Pl.'s Ex. 5 at 79:4-80:18. As such, there is no credible evidence that Omar could tell the difference between pork and pork substitutes himself.

Omar has failed to create a genuine issue of material fact with respect to whether or

not he was served actual pork by Transou or McCauley while at Pollock. A reasonable jury could not return a verdict against any of the federal defendants on the evidence presented. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).

### b. Pork Substitutes

Omar artfully argues that McCauley infringed on his First Amendment free exercise rights by serving him pork substitutes without telling him that the food was not pork. Pl.'s Opp'n 14. No case law is cited to support this proposition, and the only evidence offered to substantiate it is a deposition of Ihsan Bagby, Professor of Islamic Studies at the University of Kentucky. Id.; Pl.'s Ex. 6 at 8. Professor Bagby states that by "not informing Mr. Omar that the meat was not pork but imitation pork, they burdened Mr. Omar's practice of his religion." Pl.'s Ex. 6 at 8. Nevertheless, this is not the law. Omar has failed to cite any cases holding that being served imitation pork was an infringement of free exercise rights, or any analogous cases sufficient to place the officers on notice that this was a constitutional violation. Omar certainly has not shown in any way that this was a right sufficiently articulated to satisfy the notice requirement of qualified immunity. Kelly v. Forti, 77 F.3d 819, 821 (5th Cir. 1996). As such, the claims relating to the service of pork and pork substitutes brought by Omar against McCauley and Transou are dismissed.

### 2. Time Request Claims

Omar alleges that he requested a clock from Cosgro and requested to be told the time by McCauley and Transou. Pl.'s Ex. 7 ¶ 57. Omar also states that he verbally asked McCauley for the time. See id. In addition, he claims that he pointed to his hand where a

watch would be in order to ask for the time from both McCauley and Transou several times while he was at Pollock. See id. He alleges that while at first Transou and McCauley gave him the time when requested, they later started ignoring his requests.

Omar, however, has failed to show how this failure, even if taken as true, amounts to a violation of his free exercise rights that violates qualified immunity. Kelly v. Forti, 77 F.3d 819, 821 (5th Cir. 1996). As such, taking the allegations as true, Omar's claims based on his time requests are dismissed.

### 3. Ramadan-related Claims

First, Omar claims that he was given the wrong date for the start of Ramadan and was not provided with a calendar. As such, he did not fast on 16 November 2001. The defendants explain that this was the result of an error at the Central Office of the Bureau of Prisons. Summ. J. Mot. 23; Def.'s Statement of Material Facts ¶ 123. As such, the defendants ask that this allegation be dismissed. See Young v. Bass, #1-C-7944, 2004 WL 765874, at *2 (N.D. Ill. Apr. 7, 2004) (finding no constitutional violation when "[p]laintiff was prevented from fasting properly for two days"). Omar does not address these specific allegations in his opposition.

Second, Omar alleges that McCauley refused to serve him his meals after sunset or let him keep his meals until after sunset on 19 November 2001 and 20 November 2001. Pl.'s Opp'n 14-16. This claim turns on whether or not a *de minimis* threshold test applies to First Amendment free exercise claims. Under such a test, summary judgment would be granted as the alleged violations are *de minimis*. In the absence of such a test, however, summary

judgment would be denied, as there has been no penological interest posited by the federal defendants for the alleged activity. Cf. Turner v. Safley, 482 U.S. 78, 89 (1987). "There must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Id. (citation and quotation marks omitted).

Omar makes much of the fact that the Fifth Circuit has not clearly established that a *de minimis* test applies to First Amendment violations. Omar argues that "there simply is no such thing as a *de minimis* violation of First Amendment rights under Fifth Circuit law." Pl.'s Opp'n 15. Omar cites no Fifth Circuit case law clearly stating that this principle does not apply. He instead argues that since the Fifth Circuit has articulated a test for free exercise restrictions, see Freeman v. Texas Dep't of Criminal Justice, 369 F.3d 854, 861 (5th Cir. 2004) (considering penological interests and free exercise restrictions in upholding restrictive policy), the circuit has therefore rejected also employing a "gate-keeping" principle that a violation must be greater than *de minimis* to survive summary judgment.

In contrast, the defendants cite case law in their reply brief that potentially does establish such a *de minimis* test for free exercise claims. In Walsh v. La. High School Athletic Association, the Fifth Circuit considered a high school athletic association rule stating that "a student is ineligible to participate in interscholastic athletic competition for a period of one year if he matriculates at a high school outside of his home district after completing elementary or junior high school." 616 F.2d 152, 155 (5th Cir. 1980). The home districts are geographical zones drawn for the public high schools, and the home district for a parochial school is "the geographical attendance zone of the public school in which the

13

private or parochial school is situated." Id. There was one Lutheran high school in the area and seven Lutheran elementary and junior high schools; none of the Lutheran elementary or junior high schools were located in the same home district as the Lutheran high school. Id. As a result, "any student who enrolls at Lutheran High School upon graduation from any of the seven Lutheran elementary or junior high schools in the metropolitan New Orleans area is ineligible to compete in interscholastic athletic competition for one year." Id.

The parents of several children who were declared athletically ineligible for one year under this rule challenged the rule as a violated of free exercise rights. Id. at 154. The court, prior to conducting its analysis of the state interest and the burden on free exercise, stated that "the *de minimis* nature of the burden placed on the plaintiffs' free exercise of religion is sufficient to reject plaintiffs' first amendment challenge to the LHSAA transfer rule." Id. at 158 (emphasis added).

In a footnote, Omar points to the Supreme Court's language in Employment Division v. Smith, in which the Court warned against courts evaluating the centrality of religious beliefs or the constitutional significance of a burden placed on them. 494 U.S. 872, 887 & n.4 (1990). In the wake of this opinion, the circuits have disagreed on whether or not to ask if a particular violation is *de minimis* prior to looking for penological interests.

The Fifth Circuit has not spoken clearly on this issue. Omar argues that the court in Adkins v. Caspar refused to employ such a gate-keeping inquiry. 393 F.3d 559, 564 (5th Cir. 2004). Omar emphasizes that in this case the court does not first ask explicitly whether the intrusion on the free exercise rights of prisoners met a threshold test. In contrast, the federal

14

defendants point out that the court in Adkins agreed with an earlier court that "[t]he pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." Id. (citation and quotation marks omitted). As such, Adkins is not clear as to whether the court should determine if a particular action constitutes a burden, rather than a *de minimis* inconvenience, to free exercise rights. It is therefore instructive to look to other circuits.

The Second and Third Circuits do not employ such an inquiry. In Williams v. Morton, the Third Circuit wrote that "[t]he Prison Officials argue that it is also a prerequisite for the inmate to establish that the challenged prison policy 'substantially burdens' his or her religious beliefs. There is no support for that assertion." 343 F.3d 212, 217 (3d Cir. 2003) (citation omitted). While the Second Circuit has stated that in such cases "a court must determine when an impediment to a religious practice is significant enough to warrant judicial intervention," McEachin v. McGuinnis, 357 F.3d 197, 202 (2d Cir. 2004), the court also has held that in making this inquiry, the plaintiff "need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." Ford v. McGinnis, 352 F.3d 582, 588 (2d Cir. 2003) (citation and quotation marks omitted).

Conversely, the Ninth Circuit has examined whether a particular allegation rises to the level of greater than *de minimis* infringement. The court wrote in Freeman v. Arpaio:

> None of these allegations, even taken in the aggregate, amount to a substantial burden on the free exercise of his religion. In order to reach the level of a constitutional violation, the interference with one's practice of religion must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

15

125 F.3d 732, 737 (9th Cir. 1997) (citation and quotation marks omitted).

Later, in a case somewhat analogous to the case at bar, the Ninth Circuit addressed the free exercise implications of a correctional officer's "bringing Christian literature to work, singing Christian songs, mock-preaching, and belittling other religions" that interfered with a prisoner's attempts to pray. Canell v. Lightner, 143 F.3d 1210, 1214-15 (9th Cir. 1998). The Ninth Circuit upheld the district court's grant of summary judgment in favor of the officer, stating that "[w]hile [the officer's] evangelizing may have constituted an intrusion upon [the inmate's] prayers on some occasions during the brief period involved, we agree with the district court's conclusion that these intrusions were relatively short-term and sporadic and did not constitute a substantial interference." Id. at 1215 (citation and quotation marks omitted); cf. Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997) (finding that prison officials' refusal to provide spiritual advisor with particular beliefs to inmate was not constitutional violation).

After considering the law of other circuits, this court holds that it is a function of the court under the law to make an inquiry as to whether the actions taken by the defendants had more than a *de minimis* impact on the free exercise rights of the detainee. While courts are generally not well-suited to examining the centrality or substantiality of a particular belief to a given religion, courts regularly examine the substance of particular behaviors and therefore can apply them to a static, unquestioned concept of religious practice. Canell v. Lightner, 143 F.3d 1210, 1215 (9th Cir. 1998) (evaluating impact of specific behaviors on plaintiff's free exercise of religion and granting defendant's motion for summary judgment).

In performing this analysis, this court finds that the failure to hold Omar's meals until sunset for two of the four days of Ramadan in which Omar was at Pollock had, at most, a *de minimis* impact on his free exercise rights. While recognizing that the Supreme Court has stated in <u>Employment Division v. Smith</u> that considering the substance of a burden on a religious practice may implicate the same sorts of institutional competence concerns that centrality analysis does, this court holds that it is still within the purview of the court to consider whether the federal defendants' actions created a burden on Omar's religious practice or whether they were merely an inconvenience that did not render him unable to exercise his religion freely. At issue here appears to be the service of three meals by McCauley to Omar during Ramadan. Pl.'s Ex. 9 at 64-66. Omar himself has stated that he kept food in his cell. Summ. J. Mot. 25; Def.'s Statement of Material Facts ¶ 134. This court therefore finds that the refusal to hold three meals because of Ramadan states only a *de minimis* imposition on Omar's free exercise rights. As such, these claims are dismissed.

### 4. Mocking Claims

Omar also alleges that McCauley and Transou mocked his religion by nonverbal communication regarding his prayer and that Cosgro made a verbal statement mocking his religion practices after he prayed. Summ. J. Mot. 17-18. These claims cannot survive summary judgment because, even taken as true, they fail to allege more than a *de minimis* violation of Omar's First Amendment rights.

Omar does not allege that Transou or McCauley actually made any statements to him about his religion in mocking him, but instead states that "[i]t was not necessary for

17

Defendants to speak for this to occur; rather their laughing and other actions were interpreted by Plaintiff as mocking and ridiculing, and as such disrupted his prayers." Pl.'s Resp. to Def.'s Statement of Material Facts ¶ 81. Allegations that the defendants made statements which Omar could not hear and that they laughed while he was praying, even when coupled with Cosgro's isolated verbal statement to Omar, do not state more than a *de minimis* free exercise violation. As such, these claims are dismissed.

### C. Religious Freedom Restoration Act Claims

In addition to his First Amendment claims in Count III of the complaint, Omar brings the same allegations as violations of the RFRA in Count VI of the complaint. The parties spend a significant amount of briefing discussing whether or not the RFRA is constitutional as applied to federal officials. Although the defendants devoted a footnote to whether or not the RFRA even applies to the facts alleged, Omar does not respond to this argument in his opposition. Summ. J. Mot. 26 n.19. Upon considering the facts alleged, the court finds that the RFRA does not affect the analysis here.

Congress passed the RFRA in response to a Supreme Court decision, Employment Division v. Smith, 494 U.S. 872 (1990), in which the Court held that generally applicable and neutral laws which substantially burden religious practice need not be justified by a compelling state interest. Id. at 882-90. The RFRA, therefore, requires that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except [if it] . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that

compelling governmental interest." 42 U.S.C. § 2000bb-1. Ultimately, the RFRA is a mechanism by which Congress clarified the "reach" of the First Amendment with respect to neutral laws of general applicability. The statute arguably does technically apply to all government actions, even those that are not neutral laws of general applicability. This is because it states that it is applicable "even if the burden results from a rule of general applicability." Id. The use of the word "even" suggests that it applies in other circumstances as well. The RFRA, however, does not appear to have any effect on the scheme by which First Amendment free exercise claims are adjudicated outside the context of neutral laws of general applicability. Cf. Larsen v. U.S. Navy, 346 F. Supp. 2d 122, 136-38 (D.D.C. 2004) (dismissing RFRA claims for failure to plead neutral law of general applicability). In other words, the RFRA is a vehicle by which one who brings a free exercise violation against a neutral law of general applicability can require the court to look for a compelling interest and the least restrictive means of achieving it.

In this case, however, Omar does not address any laws of neutral applicability, nor do the defendants argue that their actions were justified by state interests. As such, the RFRA does not affect First Amendment jurisprudence at all with respect to this case. Cf. id. While Omar can bring his claim under both the First Amendment and the RFRA, the results will be the same. As explained above, Omar has failed to present a genuine issue as to any material fact with respect to his First Amendment claims. The situation is the same with respect to his RFRA claims. These claims are dismissed.

D.  **Other Claims**

In the amended complaint, Omar brings the same Fifth Amendment claims against McCauley and Transou, and the same Fourth Amendment claims against Transou, as those previously dismissed against the other defendants. Omar does not discuss these issues in his opposition. Under the law of the case, these claims are dismissed. Omar v. Casterline, 288 F. Supp. 2d 775, 782-83 (W.D. La. 2003) (dismissing these claims against other defendants under qualified immunity); see also Loumar, Inc. v. Smith, 698 F.2d 759, 762 (5th Cir. 1983) (noting rationale for "law of the case doctrine . . . is the same as that for *stare decisis*: a court will follow a ruling previously made unless the prior ruling was erroneous, is no longer sound, or would work an injustice").

## CONCLUSION

Accordingly, the court finds that there is no genuine issue of material fact and that the federal defendants are entitled to summary judgment as a matter of law. The motion for summary judgment [#137] filed by the federal defendants is GRANTED. All remaining claims by Omar against Carl Casterline, Roger Cosgro, Eric Transou, and K. McCauley are DISMISSED WITH PREJUDICE.

Alexandria, Louisiana

8  February 2006

F.A. LITTLE, JR.
UNITED STATES DISTRICT JUDGE